454 A.2d 524

**Terry L. BOYER, Appellant,**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW.**

Supreme Court of Pennsylvania.

Argued Oct. 25, 1982.

Decided Dec. 30, 1982.

Michael Goldberg, Marion Frankston, Harrisburg, for appellant.

Charles Hasson, Asst. Atty. Gen., for appellee.

Before O'BRIEN, C.J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

## OPINION OF THE COURT

O'BRIEN, Chief Justice.

Appellant, Terry Boyer, was discharged from his employment with the City of Lancaster on May 18, 1978. Following a hearing, an unemployment compensation referee denied appellant's request for benefits on the ground of willful misconduct under § 402(e) of the Unemployment Compensation Law, 43 P.S. § 802(e). The denial of benefits was affirmed by the Unemployment Compensation Board of Review [hereinafter cited as "Board"], and thereafter by the Commonwealth Court. *Boyer v. Unemployment Compensation Board of Review,* 51 Pa.Cmwlth. 191, 415 A.2d 425 (1980). We granted appellant's petition for allowance of appeal.

Boyer was discharged from his employment because he wrote a letter to his supervisor, Roy Falcone, and sent copies to four other Lancaster employees. The letter, titled "Unjustified Memos", was a response to a number of memoran-

da appellant had received from Falcone in the preceding eighteen-month period. Appellant had received a memorandum from Falcone dated November 3, 1977, alleging that Boyer had engaged in illegal conduct in his use of a vehicle owned by the City of Lancaster. A copy of this memorandum was placed in appellant's file. Appellant received a second memorandum from Falcone, also dated November 3, 1977, alleging that appellant had misused a city vehicle, and further threatening appellant with suspension. Copies of this memorandum were sent to the personnel department and to Lee Mowery, the union local president, and one copy was placed in appellant's file.

One month later, Mr. Boyer received another letter, dated December 5, 1977, in which appellant was informed of a one day suspension without pay. Copies of this letter were sent to Arthur Morris, the Director of Public Works, Howard Goldberg, Personnel Manager, and again, one to Mowery. Thereafter appellant received another memorandum from Falcone, dated April 5, 1978, reprimanding Boyer for careless work and a poor attitude. Again, disciplinary action was threatened. Copies of this memorandum were sent to the personnel department, to Morris, to the union steward, and additionally, to Lancaster Mayor Scott. Finally, Boyer received a memorandum from Falcone dated April 27, 1978, reprimanding him for careless workmanship and a poor attitude. Copies of this memorandum were sent to the personnel department, to a union representative, and one copy was placed in appellant's file.

Appellant believed the memoranda to be unsubstantiated and false,[1] and possibly the result of racial discrimination.[2]

1. It appears that appellant disputed the allegations of misconduct on more than one occasion. For example, the letter of December 5, 1977, accused appellant of seeking permission to miss a portion of a day's employment in order to keep an appointment for which he never appeared. At the hearing, Falcone admitted that Boyer substantiated his whereabouts on the afternoon in question. Notes of Testimony at 21.

2. Appellant testified that prior to beginning the position from which he was terminated, he had bid unsuccessfully for other jobs. Be-

It is reasonable, we believe, that appellant would respond to the continuing allegations as he did.

The question before us is not whether the employer had the right to discharge Mr. Boyer, but whether appellant is entitled to unemployment benefits under the provisions of the Unemployment Compensation Law. *Frumento v. Unemployment Compensation Board of Review,* 466 Pa. 81, 351 A.2d 631 (1976). Legal conclusions drawn by the Board are subject to judicial review. *LeGare v. Unemployment Compensation Board of Review,* 498 Pa. 72, 444 A.2d 1151 (1982); *Taylor v. Unemployment Compensation Board of Review,* 474 Pa. 351, 378 A.2d 829 (1977). The question of whether an employee's actions constitute willful misconduct is a question of law, subject to this Court's review. *McLean v. Unemployment Compensation Board of Review,* 476 Pa. 617, 383 A.2d 533 (1978).

In *Frumento v. Unemployment Compensation Board of Review, supra,* this Court adopted a concept of good cause when assessing whether an employee's actions fall within the definition of willful misconduct. In *Frumento* we stated, "where the action of the employee is justifiable or reasonable under the circumstances it can not be considered wilful [sic] misconduct." *Id.* 466 Pa. at 87, 351 A.2d at 634.

With this standard in mind, we examine the circumstances surrounding appellant's discharge. As noted previously, appellant received five memoranda from his supervisor over an eighteen-month period. Copies of each memorandum were sent to various Lancaster employees. The record reveals that appellant initially tried to resolve the problems by

cause he felt that he was the victim of racial discrimination, appellant filed a complaint with the Pennsylvania Human Relations Commission on August 30, 1977. On September 10, 1977, Mr. Boyer was awarded the position from which he was terminated.

Furthermore, at the hearing before the referee, appellant's attorney asked Mr. Falcone if he had failed to institute disciplinary proceedings against Appellant Boyer because he was black. Falcone refused to answer the question and the referee refused to compel Mr. Falcone to respond. Notes of Testimony at 24.

speaking to both his supervisor and to the personnel manager. Following the incident that precipitated the memorandum dated April 5, 1978, appellant and his supervisor met to discuss the problem. Mr. Falcone testified as follows.

"By Appellant's Attorney: You had a personal conversation about it, is that correct?

"Mr. Falcone: Right, and . . .

"And there was a disagreement. He thought that he was being treated unfairly and you felt that he was being treated fairly.

"Right, and neither one of us were satisfied."

Notes of Testimony at 23. Mr. Falcone testified subsequently, "Our discussions . . . were not getting us any place," and communication had "broken down." Notes of Testimony at 24.

Appellant testified that Mr. Falcone had not initiated any discussions with him concerning Falcone's dissatisfaction with appellant's job performance.

"By Appellant's Attorney: Did your supervisor come and approach you before he wrote these two memos to try and discuss it to try and find out your feelings about it?

"By Appellant: No he didn't. He gave me the memos first and I had to go to him after the memos were given."

Notes of Testimony at 55. Appellant Boyer testified that because he felt that his relationship with his supervisor was deteriorating, he contacted Howard Goldberg, the Director of Administrative Services and Personnel Manager.

"By Appellant's Attorney: Was this the period when you approached Mr. Goldberg? About your problems?

"By Appellant: Yes, it's about the same time.

"Do you recall just generally when, why you approached Mr. Goldberg or what you explained to him about your feelings?

"Yes, because I felt as though I was being treated unfairly . . . . I tried to talk to Mr. Goldberg and tried

to settle the differences that uh, Mr. Falcone and myself had.

"Did Mr. Goldberg take any action on behalf of you or after you had made your thoughts and feelings known to him?

"No he didn't take any action at all.

"Did he indicate to you, did he say something to you about it?

"Yes he did say. He said I will look into the matter."

Notes of Testimony at 50.

Mr. Goldberg, however, offered contrary testimony about his meetings with appellant.

"By Appellant's Attorney: Do you recall Mr. Boyer coming to your office earlier in his term of employment and speaking to you about problems that he felt that he was having?

"By Mr. Goldberg: Yes, Mr. Boyer came to me on one, at least one occasion if not two, to talk to me about problems.

"And were you able to resolve those problems to Mr. Boyer's satisfaction?

"*No, I didn't attempt to resolve them at all because I didn't consider them to be problems.*"

Notes of Testimony at 10 [emphasis added].

At the hearing before the referee, Mr. Goldberg asserted that appellant should have filed a grievance with the union. The record discloses that appellant had taken steps that he believed appropriate in order to file a grievance when his employment was terminated. However, up until that time the testimony suggests that appellant did not believe there was any formal discipline to grieve. Even Mr. Falcone acknowledged that he continually avoided entering formal discipline. Notes of Testimony at 23.

Both Mr. Falcone and Mr. Goldberg emphasized that they were offended by appellant's use of the word "reprisal" in his memorandum. It is clear from a plain reading of the memorandum, and from Mr. Boyer's testimony before the

referee, that appellant was not educated in the finer points of English usage and grammar. Further, at the hearing before the referee, Mr. Boyer explained that he used the word "reprisal" to mean "response." Notes of Testimony at 57. This error is not fatal to appellant's claim for benefits.

Appellant attempted to resolve the continuing problems with his supervisor through personal discussions with that supervisor and with Mr. Goldberg, the personnel manager. Because there were no discussions between appellant and his supervisor before Falcone documented the allegations of poor workmanship in written memoranda, Mr. Boyer was continually forced to dispute, verbally, allegations already documented in writing. As revealed by the testimony, Goldberg made no attempt to resolve the situation. Mr. Boyer apparently also believed that because formal discipline was always threatened, but never imposed, there was nothing to grieve to the union. He finally chose to respond in writing to the allegations made about his careless workmanship and poor attitude. He sent copies of his response *only to those persons who had received his supervisor's memoranda.*

Accordingly, appellant's actions were justifiable and reasonable, *Frumento v. Unemployment Compensation Board of Review, supra,* and cannot be deemed willful misconduct under § 402(e).

The Order of the Commonwealth Court is reversed and the case is remanded to the Unemployment Compensation Board of Review for the computation of benefits.

FLAHERTY, J., files a dissenting opinion in which McDERMOTT, J., joins.

FLAHERTY, Justice, dissenting.

I dissent. The majority's view is in error in at least two respects. First, it confuses action that is justifiable or reasonable with action that may be explained by a cause and effect analysis, but which, nevertheless, may be unreasonable. Second, although I agree that the *Frumento* case is apposite to the question of whether Boyer's acts constituted

misconduct which would make him ineligible for unemployment benefits,[1] I disagree that the majority's interpretation and application of the *Frumento* standards in this case is consistent with either the requirements of the Unemployment Compensation Act itself, or with this Court's own past interpretation of the act.

The purpose of the act is well expressed in the section entitled "Declaration of public policy":

Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of the Commonwealth. Involuntary unemployment and its resulting burden of indigency falls with crushing force upon the unemployed worker, and ultimately upon the Commonwealth and its political subdivisions in the form of poor relief assistance. Security against unemployment and the spread of indigency can best be provided by the systematic setting aside of financial reserves to be used as compensation for loss of wages by employes during periods *when they become unemployed through no fault of their own.* The principle of the accumulation of financial reserves, the sharing of risks, and the payment of compensation with respect to unemployment meets the need of protection against the hazards of unemployment and indigency. The Legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this Commonwealth require the exercise of the police powers of the Commonwealth in the enactment of this act for the compulsory setting aside of unemployment reserves to be used for the benefit of persons *unemployed through no fault of their own.*

1.  Under section 402(e) of the Unemployment Compensation Law, Act of December 5, 1936, Second Ex. Sess, P.L. [1937] 2897, *as amended,* 43 P.S. § 802(e):

    An employe shall be ineligible for compensation for any week—

    \*     \*     \*     \*     \*     \*

    (e) In which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work. . . .

43 P.S. § 752 (Emphasis supplied). Only last year we stated that this section

> "is not merely a perfunctory preface, but is, rather, the keystone upon which the individual sections of the Act must be interpreted and construed." *Lybarger Unemployment Compensation Case,* 418 Pa. 471, 476, 211 A.2d 463, 466 (1965). The objective of the Act, as declared in section 3, is to insure that employees *who become unemployed involuntarily* are provided some semblance of economic security . . . or, as more recently expressed "to aid those individuals who, *through no fault of their own,* face the grim prospect of unemployment." *Richards v. Unemployment Compensation Board of Review (UCBR),* 491 Pa. 162, 169, 420 A.2d 391, 395 (1980).

*Penn Hills School District v. Unemployment Board,* 496 Pa. 620, 624–625, 437 A.2d 1213, 1215 (1981) (Emphasis supplied).

Although this Court and the lower courts have established various standards for the determination of "willful misconduct" depending upon the factual situations involved in each type of case, the standard most directly applicable here [2] is

---

**2.** In a case involving discharge because of an employee's refusal to comply with an employer's directive, for example, this Court has stated that:

> . . . we must evaluate both the reasonableness of the employer's request in light of all the circumstances, and the employee's reasons for noncompliance. The employee's behavior cannot fall within "wilful misconduct" if it was justifiable or reasonable under the circumstances, since it cannot then be considered to be in wilful disregard of conduct the employer "has a right to expect." In other words, if there was "good cause" for the employee's action, it cannot be charged as wilful misconduct. *Frumento, supra,* [466 Pa.] at 634, 351 A.2d 631; *Crib Diaper Service v. Unemployment Compensation Board of Review,* 174 Pa.Super. 71, 98 A.2d 490, 492 (1953).

*McLean v. Unemployment Compensation Board,* 476 Pa. 617, 620, 383 A.2d 533, 535 (1978). Although the standard for evaluating whether an employee's act constitutes "willful misconduct" is formulated differently where there has been a directive and a refusal to obey, an essential consideration in that type of case and in the present case is reasonableness of the employee's act in the circumstances. Further, this consideration of reasonableness is normally inextricably linked with a consideration of the standards of behavior

that articulated in *Frumento v. Unemployment Compensation Board of Review, supra.* In that case we adopted the test of "good cause" for the employee's action. Under this test,

> where the action of the employee is *justifiable or reasonable under the circumstances* it can not be considered wilful misconduct since it can not properly be charged as a wilful disregard *of the employer's intents or rules or the standard of conduct the employer has a right to expect.*

466 Pa. at 87, 351 A.2d at 634 (Emphasis supplied).

As this Court stated in *Woodson v. Unemployment Compensation Board of Review,*

> A determination of whether an employee has engaged in willful misconduct can therefore only be made *by considering what standard of conduct an employer reasonably requires.* Standards expected by one employer may of course not be the standards of another employer. Willful misconduct cannot therefore be considered in a vacuum. It must be considered in relation to the particular employees and to *the reasonable standards expected by a particular employer.*

461 Pa. 439, 442–443, 336 A.2d 867, 868 (1975) (Emphasis supplied). In the present case the employer's "Personnel Policies: City of Lancaster Pennsylvania" contains the following provision:

> *Section 071 Disciplinary Action*
>
> A City employee may be suspended without pay, reduced in his or her position and/or pay or dismissed for just cause. Any one of the following being examples of a just cause requiring disciplinary action:
>
> \*    \*    \*    \*    \*    \*
>
> *071.3 Discourtesy* The use of discourteous action or language towards the general public or fellow employees.

From the inclusion of this provision in the personnel policies of the city, it would appear that the city expects courteous

the employer has a right to expect. *See LeGare v. Unemployment Compensation Board of Review,* 498 Pa. 72, 76, 444 A.2d 1151, 1153 (1982).

conduct from its employees, an expectation which is incontestably reasonable.

This brings us to a consideration of Boyer's letter, the text of which is conspicuously absent from the majority's opinion:

Date May 4, 1978

To: Roy Falcone,
      City Traffic Engineer
From: Terry Boyer,
        Traffic Technician I
Subject: Unjustified Memos

In response to these outrageous attempts to exploit and undermine my character as a city official, a public figure in this community, and a city tax-payer. I am responding to these memos presented to me as listed below:

November 3, 1977

November 3, 1977

December 5, 1977

April 5, 1978

April 27, 1978

The purpose of this letter is constructed mainly to constitute a reprisal concerning your ruthless attacks upon my character as an employee of the City of Lancaster. Your inaccurate and calculating underhanded tactics have caused an inevitable reprisal on my behalf. Let me begin this reprisal by stating, that as an employee for the City of Lancaster holding the position of Traffic Technician I, I am fully aware as to the reason I was promoted to this position other than my qualifications stated. I am also fully aware that there was no training prior to my new position or after. Now, to my knowledge, the word training, meaning explaining and teaching while demonstrating, does not coincide with your definition of the word 'training', nor does it coincide with the dictionary's definition of the word.

Concerning my attitude on the job, whether it be working inside with my fellow employees or while driving the city car, I have never been aware or made aware by any

my [sic] peers that my attitude was poor, which here again brings me to believe that your reprimands have been initiated falsely and maliciously, possibly due to personal racial overtones.

Concerning 'Carelessness and excessive time spent in fulfilling duties' during the period between March 29 and April 3, If [sic] you will re-check your memo, Mr. Falcone, you stated that and I quote, 'It took two men to get the data for a simple sketch because of my careless work and poor attitude'. Then with very little thought you stated that 'Essentially, this is what Bill Maney had to do in the final analysis anyway'. If this is the case Roy, you wasted time and the taxpayers money by sending me, an un-trained man, for this particular task.

You sent a man with a poor work attitude and careless to do the job that Bill Maney, who is trained for this position and paid for this position, should have done in the beginning.

I have also discussed your unorthodox supervision with other city employees. They have expressed distaste for your attitude and your inability to deal with your subordinates.

Last of all, Roy, to discuss your last memo dated April 27, 1978, would only be reiterating the previous paragraph.

In conclusion, Roy, I feel justified in my reactions to remind you that I too have resolved to limit myself to unnecessary grievences [sic] that neither one of us should endure.

cc:  Mayor Scott
     Arthur Morris,
  Director of Public Works
     Howard Goldberg,
  Personnel Manager
     Lee Mowery,
  President of Local 1896
  A.F.S.C.M.E.

It is plain to me that this letter falls within the type of behavior which violates legitimate employer expectations of restrained and courteous behavior, and further, that it is unreasonable in the circumstances.

Where other paths are open to the actor to accomplish permissible goals—here, presumably to get a hearing on the merits of the reprimands—a course of action which is aggressive and involves personal attacks on supervisory personnel can be fairly described as discourteous, unreasonable under the circumstances, and not in harmony with standards of conduct which the employer has a right to expect. Other paths available to appellant in this case were to ask for a meeting to discuss the reprimands, or simply to file a union grievance.[3] He unwisely chose neither of these courses of action, but, instead attacked the character and the professional competence of his supervisor. Such an attack may or may not have been justified in a hearing on the reprimands, but it was inappropriate, discourteous in the sense of "vindictive", and unreasonable in a letter requesting such a hearing.

It will be recalled that the letter, which characterizes Mr. Falcone as unable to deal with subordinates [i.e., incompetent], malicious, an initiator of false claims, racially biased, ruthless, inaccurate, calculating and underhanded, was sent not only to Mr. Falcone, but also to the mayor, the director of public works, and the personnel manager. The majority's bland observation that Boyer sent copies only to those

3. The union contract applicable in this case provides:
*　　*　　*　　*　　*　　*
ARTICLE XXXVII
Disciplinary Action
Section 1 It is understood and agreed an employee may not be discharged, disciplined, suspended or demoted except for just and sufficient cause. It is further understood and agreed that such action is grievable under the contract grievance procedure.
ARTICLE XXXVIII
Grievance Procedure/Arbitration
Section 1 Any complaint alleging a specific violation of an article of this collective bargaining agreement shall be processed as a grievance under this procedure and subject to the following terms and conditions:
*　　*　　*　　*　　*　　*

persons to whom Falcone had sent copies of the disciplinary memos begs the question of why Boyer should have sent any copies at all, since this letter was not merely a request for a fair hearing, but a full scale attack on the character of his supervisor. Although it may be permissible for an employee to seek relief from an official senior to his own supervisor where the employee has a dispute with his supervisor, in the normal case, seeking such relief would not involve invectives of the type used by appellant in his letter. The letter, therefore, was not merely a request for intervention and fair dealing, but was also a "reprisal," as appellant himself characterized it. As such, the letter constituted "willful misconduct."

The majority's discussion of the "reasonableness" of Boyer's action merely establishes, at least theoretically, that *Boyer* thought his action was reasonable. But if that is to be the test, what employee discharged for cause could ever be denied unemployment compensation benefits? Boyer may have felt that he was wronged when Falcone did not talk with him about a particular matter before issuing a reprimand, but there is no evidence of record that such a discussion is required. Boyer's anger may explain his willingness to risk damage to Falcone's presumed good reputation by addressing a letter to Falcone's superiors insinuating that Falcone was a racist, but that feeling of anger does not make Boyer's action reasonable. Boyer may have felt that he could not grieve the reprimands that Falcone put in his file, but if he was correct in assuming this, other actions short of character assassination were open to him, and if he was not correct, his mistake hardly transforms his letter into a reasonable response. Finally, the majority mentions Mr. Goldberg's testimony as evidence of Boyer's reasonableness. At 526. Goldberg testified that he did not attempt to resolve the complaints made by Boyer "because I didn't consider them to be problems." When one considers the complaints—Boyer did not like getting adverse comment on his breaking of rules and on the quality of his work—one can understand both the Goldberg response and Boyer's

dissatisfaction with it. But again, dissatisfaction does not make Boyer's response reasonable. *The majority in this case applies a totally subjective standard for reasonableness which was contemplated neither in the Unemployment Compensation Act nor in our prior cases.*

The Unemployment Compensation Law was *intended* to *provide benefits for those unfortunate persons who lose their employment through no fault of their own.* When an employee attacks the character and competence of his supervisor in violation of reasonable employer expectations of employee behavior, bringing about his own discharge, his conduct can hardly be said to be without fault. This is not to say that an employee may not challenge disciplinary action taken against him, but only that if he does, he should not expect to preserve his eligibility for unemployment benefits if he violates legitimate employer rules and/or expectations in the course of making an otherwise permissible challenge.

The Commonwealth Court should be affirmed.

McDERMOTT, J., joins this dissenting opinion.