Dale Harbel, :
      Petitioner :
          :
    v.      :
          :
Unemployment Compensation :
Board of Review,     : No. 438 C.D. 2017
     Respondent : Argued: December 4, 2017


BEFORE: HONORABLE ROBERT SIMPSON, Judge
     HONORABLE ANNE E. COVEY, Judge
     HONORABLE JAMES GARDNER COLINS, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY        FILED: December 27, 2017


    Dale Harbel (Claimant) petitions this Court for review of the Unemployment Compensation (UC) Board of Review's (UCBR) March 17, 2017 order affirming the Referee's decision denying Claimant UC benefits under Section 402(e) of the UC Law (Law).[1] Claimant presents two issues for this Court's review: (1) whether the UCBR's decision is supported by substantial evidence; and (2) whether the UCBR erred as a matter of law by determining that Claimant committed willful misconduct. After review, we affirm.

    Claimant was last employed by C & T Machining (Employer) as a full-time sales engineer earning a $37,000.00 annual base salary from June 16, 2003, through his last day of work on March 31, 2016. On March 30, 2016, Employer's General Manager Rick Twine (Twine) informed Claimant that he would not be receiving his yearly bonus because Claimant had not provided requested inventory

---

[1] Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e) (referring to willful misconduct).

information. Before leaving for the day, Claimant threw a packet of inventory information on Twine's desk which included Claimant's handwritten notations on current inventory. On March 31, 2016, Twine again informed Claimant that he would not be receiving his yearly bonus due to the inventory discrepancies. Claimant told Twine that he would get his bonus one way or another, and left Twine's office. Claimant later returned to Twine's office and asked Twine to lay him off because he was not quitting. Twine told Claimant that he would not lay him off, and Claimant left the office again. Claimant returned to Twine's office a few minutes later and informed Twine that he would sit at his desk or stay at home and not perform his job duties. Claimant left Twine's office. Twine followed Claimant and told Claimant that effective immediately, he was no longer employed. Employer discharged Claimant for his insubordinate language on March 31, 2016.

Claimant applied for UC benefits. On September 23, 2016, the Allentown UC Service Center determined that Claimant was not eligible for UC benefits pursuant to Section 402(e) of the Law. Claimant appealed and a Referee hearing was held. On October 27, 2016, the Referee affirmed the UC Service Center's determination. Claimant appealed to the UCBR. On March 17, 2017, the UCBR adopted and incorporated the Referee's findings and conclusions and affirmed the Referee's decision. Claimant appealed to this Court.[2]

Initially,

Section 402(e) of the Law provides that an employee is ineligible for [UC] benefits when his unemployment is due

---

[2] "Our scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the findings of fact were unsupported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704." *Turgeon v. Unemployment Comp. Bd. of Review*, 64 A.3d 729, 731 n.3 (Pa. Cmwlth. 2013).

2

to discharge from work for willful misconduct connected to his work. The employer bears the burden of proving willful misconduct in a[] [UC] case. Willful misconduct has been defined as (1) an act of wanton or willful disregard of the employer's interest; (2) a deliberate violation of the employer's rules; (3) a disregard of standards of behavior which the employer has a right to expect of an employee; or (4) negligence indicating an intentional disregard of the employer's interest or a disregard of the employee's duties and obligations to the employer.

*Dep't of Transp. v. Unemployment Comp. Bd. of Review*, 755 A.2d 744, 747 n.4 (Pa. Cmwlth. 2000) (citation omitted). "If the employer satisfies its burden, the burden shifts to the employee to show that he . . . had good cause for his . . . conduct. 'A claimant has good cause if his . . . actions are justifiable and reasonable under the circumstances.'" *Grand Sport Auto Body v. Unemployment Comp. Bd. of Review*, 55 A.3d 186, 190 (Pa. Cmwlth. 2012) (citation omitted) (quoting *Docherty v. Unemployment Comp. Bd. of Review*, 898 A.2d 1205, 1208-09 (Pa. Cmwlth. 2006)).

Claimant first argues that the UCBR's decision is not supported by substantial evidence. The law is well-established:

[T]he [UCBR] is the ultimate fact-finder in [UC] matters and is empowered to resolve all conflicts in evidence, witness credibility, and weight accorded the evidence.[3] **It is irrelevant whether the record contains evidence to support findings other than those made by the fact-finder**; the critical inquiry is whether there is evidence to support the findings actually made. Where substantial evidence supports the [UCBR's] findings, they are conclusive on appeal.

*Ductmate Indus., Inc. v. Unemployment Comp. Bd. of Review*, 949 A.2d 338, 342 (Pa. Cmwlth. 2008) (citations omitted; emphasis added). This Court has explained:

Substantial evidence is relevant evidence upon which a reasonable mind could base a conclusion. In deciding

---

[3] Here, the Referee expressly stated: "The Referee resolves any conflicts in testimony in favor of [] Employer." Referee Dec. at 2.

whether there is substantial evidence to support the [UCBR's] findings, this Court must examine the testimony in the light most favorable to the prevailing party, . . . giving that party the benefit of any inferences which can logically and reasonably be drawn from the evidence.

*Sanders v. Unemployment Comp. Bd. of Review*, 739 A.2d 616, 618 (Pa. Cmwlth. 1999).

Here, Twine testified:

E[mployer's] L[awyer] Okay. Then tell us what occurred between you and [Claimant] on the 30th.

E[mployer's] W[itness] **On the 30th I mentioned to [Claimant] that he wasn't receiving his bonus** because I hadn't received information that I had been requesting from him, which would have allowed us to basically get to the bottom of the tens of thousands of dollars of missing inventory.[4] He was upset obviously. **By the end of the day** [**Claimant**] **came to my office and threw down on my desk what is now considered inventory counts**, the paper that's inventory counts [Service Center Ex. 17 Inventory Counts]. These are the papers that [Claimant] delivered to me on March the 30th in the afternoon before the end of the day.

. . . .

EL What happened next?

EW Well basically what happened was after he put these things in front of me I got – of course we came to the end of the day. The next day came around and I had done some, I had done some [sic] research, looked at these numbers and I mean there was no – basically looking at this list, I mean you can see there are no numbers provided for many of these items on this list. And I had already done some preliminary work on this inventory count reconciliation

---

[4] Twine explained: "[Employer] was trying to get to the bottom of the inventory issue at [the] facility; why [Employer was] carrying what appeared to be an exorbitant amount of inventory for certain items, and negative inventory for other items in [Employer's] – [Employer's] [sic] computer system." Notes of Testimony, October 26, 2016 at 11. Twine expounded that he "attempt[ed] to get [] Claimant to give [him] counts, actual inventory counts of products that [he] had questions about, that appeared to be missing from [Employer's] inventory levels." *Id.*

4

sheet. I had plugged these numbers into it, and basically the next day [Claimant] and I had another meeting.

EL That would be March 31st?

EW March 31st.

EL What occurred?

EW I **pretty much told** [] **Claimant the next day that he would not be receiving a bonus for that year**. I mean based on the lack of cooperation, the missing inventory, the expense to the company for the missing inventory, and he at [that] point said he would get his bonus one way or another.

EL What occurred next?

EW He stormed out of my office at that point. A little bit later he came back to my office and he looked at me and he said why don't you just lay me off, and I said I am not going to lay you off. He said well I'm not going to quit. So he left my office again and a little bit later he came back in and the next conversation was he came back in my office [sic] and said that anybody can be responsible for taking his inventory. He blamed it on other salesmen; he blamed it on the sales manager and other salesmen taking his inventory out of the warehouse area; he blamed it on the gal who does the invoicing for sabotaging the invoices because she didn't like him. And I pretty much told him that, you know, the inventory tracking process was his responsibility, and that he was not going to be pushing that responsibility off on anybody else. It was his responsibility. Nobody else was responsible, and he would not be paid his bonus. **At that point in time he said I will sit at my desk or I will stay home and not perform my duties, and he stormed out of my office and went into the warehouse**.

Notes of Testimony, October 26, 2016 (N.T.) at 13-15 (emphasis added). Twine recounted that thereafter he "followed [Claimant] out into the warehouse and [] told him effective immediately he was no longer employed with [Employer]." N.T. at 15. Clearly, refusing to perform one's assigned employment duties is acting beneath the standards of behavior an employer has the right to expect of an employee.

5

Accordingly, examining the testimony in the light most favorable to Employer, as we must, and giving Employer the benefit of any inferences which can logically and reasonably be drawn from the evidence, substantial evidence supports the UCBR's decision.

Claimant next argues that the UCBR erred as a matter of law by determining that Claimant committed willful misconduct for stating that he refused to work. Specifically, Claimant contends that he made the statement in the heat of the moment and therefore it does not rise to the level of willful misconduct. Ultimately, "[t]he question of whether conduct rises to the level of willful misconduct is a question of law to be determined by this Court." *Scott v. Unemployment Comp. Bd. of Review*, 105 A.3d 839, 844 (Pa. Cmwlth. 2014).

Our Supreme Court has explained:

The rationale upon which this concept of good cause was developed was that **where the action of the employee is justifiable or reasonable under the circumstances it can[]not be considered wil[l]ful misconduct** since it can[]not properly be charged as a wil[l]ful disregard of the employer's intents or rules or the standard of conduct the employer has a right to expect.

*Frumento v. Unemployment Comp. Bd. of Review,* 351 A.2d 631, 634 (Pa. 1976) (emphasis added).

Although Claimant asserts that his statement was made "in the heat of the moment" upon being told he would not get his bonus, Claimant Br. at 10, Claimant was advised he would not receive a bonus the day before he made said statement. *See* Referee Dec. at 1; Finding of Fact (FOF) 2, 3. While Claimant's behavior after initially being informed he would not receive his bonus, i.e., throwing his inventory reports on Twine's desk before leaving for the day, may not have risen to willful misconduct, Claimant's refusal to work after being told again the next day was not "justifiable or reasonable under the circumstances[.]" *Frumento,* 351 A.2d at

6

634; *see also Jones v. Unemployment Comp. Bd. of Review,* 373 A.2d 791, 792 (Pa. Cmwlth. 1977) ("The subsequent refusal . . . after a 'cooling-off period' . . . was neither reasonable nor justifiable."). This conclusion is especially true here where Claimant not only refused to work, but also, prior thereto asked to be laid off and told Twine he would not quit. Accordingly, the UCBR properly determined that Claimant's refusal to perform his employment duties was willful misconduct.

> Claimant argues in the alternative that
>
> this case should be reviewed as [a] voluntary quit case. To this end, the alleged statement that [Claimant] would not perform any work, if believed, could be viewed as a constructive quit. As [Claimant] had a necessitous and compelling reason to quit his employment, he is eligible for benefits under the [Law].

Claimant Br. at 12. We disagree. "Whether a claimant was discharged is a question of law, the resolution of which is dependent on the facts found by the [UCBR]." *Beverly Enters., Inc. v. Unemployment Comp. Bd. of Review,* 702 A.2d 1148, 1151 (Pa. Cmwlth. 1997).

Here, the Referee opined that "Claimant specifically denied that he resigned." Referee Dec. at 2. Claimant's testimony supports this conclusion. First, when asked whether he was "discharged," or he "quit," or if there was "some other reason" for his separation, Claimant responded: "I was fired." N.T. at 7. Further, Claimant testified that he expressly told Twine: "I'm not going to quit[.]" N.T. at 27. Accordingly, the case was properly reviewed under Section 402(e) of the Law, i.e., willful misconduct.

For all of the above reasons, the UCBR's order is affirmed.

_____
ANNE E. COVEY, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dale Harbel,                                    :
                              Petitioner        :
                    v.                          :
                                                :
Unemployment Compensation                       :
Board of Review,                                :       No. 438 C.D. 2017
                              Respondent        :

## O R D E R

AND NOW, this 27th day of December, 2017, the Unemployment Compensation Board of Review's March 17, 2017 order is affirmed.

_____
ANNE E. COVEY, Judge